**\*NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____
                                                    :
UNITED STATES OF AMERICA            :
                                                    :
                          Plaintiff,          :                    Criminal No. 10-104 (FLW)
                                                    :
             v.                                   :                    **OPINION**
                                                    :
RONALD SALAHUDDIN and SONNIE   :
L. COOPER                                     :
                          Defendants.      :
_____:

<u>**WOLFSON, United States District Judge:**</u>

On October 14, 2011, Defendants Ronald Salahuddin ("Salahuddin") and Sonnie Cooper ("Cooper") (collectively "Defendants") were convicted by a jury of conspiracy to obstruct interstate commerce by extortion under color of official right, in violation of 18 U.S.C. § 1951(a) (the "Hobbs Act").  Defendants were acquitted on counts of attempting to violate the Hobbs Act and violating the Hobbs Acts.  Now Defendants each move the Court to enter an acquittal under Federal Rule of Criminal Procedure 29 because of an insufficiency of the evidence or to vacate the conviction and order a new trial under Rule 33 because the conviction was against the weight of the evidence.  Additionally, Salahuddin argues his conviction should be vacated because (1) of alleged <u>Brady</u> violations by the Government; (2) the Court improperly instructed the jury, and (3) his intent was only to facilitate and promote minority hiring, not to violate the law.  And Cooper argues his conviction should be vacated because (1) the Government engaged in shocking, outrageous, and intolerable behavior and (2) the Government selectively prosecuted Cooper and Salahuddin because they were African American, while not prosecuting other

potential Caucasian targets.  For the reasons set forth below, Defendants' motions are denied.

## I.      BACKGROUND

The following is a brief summary of the Government's allegations.  Salahuddin was

formerly Deputy Mayor of the City of Newark in charge of Public Enforcement and Cooper

owned a demolition business in Newark.  The conspiracy between the two involved a circular

plan whereby Salahuddin would direct government contracts to a third party, Nicholas

Mazzocchi ("Mazzocchi"), if Mazzocchi would then subcontract work to Cooper.  This would

then benefit Salahuddin, who allegedly had a silent financial interest in Cooper's business, S.

Cooper Brothers Trucking.

The Government claimed that between July 2006 and December 2007, Salahuddin and

Cooper conspired to use Salahuddin's official position to steer demolition contracts from the

City of Newark and the New Jersey Devils to Mazzocchi, who owned and operated Mazzocchi

Wrecking, Inc, a demolition company.  If Salahuddin could award contracts to Mazzocchi—or

influence other Newark officials to award contracts to Mazzocchi—then Mazzocchi was

expected to subcontract work to Cooper.  Cooper would profit directly through the work and

Salahuddin indirectly through his hidden financial relationship with Cooper.  Further, Salahuddin

asked Mazzocchi to contribute to certain political causes supported by the Newark Mayor's

Office and other Newark public officials to make it appear that Mazzocchi was a "friend of the

administration" in order to facilitate awarding the contracts to Mazzocchi.

The Government argued that the idea for the conspiracy originated when Salahuddin met

with Joseph Parlavecchio ("Parlavecchio"), who provided consulting work to several Newark

demolition companies, including Mazzocchi's.  Indeed, Salahuddin and Cooper were introduced

to Mazzocchi through Parlavecchio.  Unbeknownst to the other three, Mazzocchi was

cooperating with the F.B.I. and was recording his conversations with Salahuddin, Cooper, and Parlavecchio.[1]  On July 29, 2006, and August 5, 2006, Parlavecchio met with Mazzocchi to discuss that he had met with Salahuddin.  Parlavecchio told Mazzocchi that if Mazzocchi wanted more demolition work in Newark—where he had not received a contract in over five years—he would have to subcontract work to Cooper.  Mazzocchi then met in person with Cooper individually, met with Cooper and Salahuddin together, and spoke with both on the telephone numerous times over the next year; Mazzocchi discussed obtaining demolition contracts from the City of Newark as well as demolition work in connection with the New Jersey Devils Stadium that was being built in Newark.  All three discussed how Cooper should be given some work if Mazzocchi received contracts from Newark.

The Government also sought to prove that Salahuddin and Cooper shared a significant financial relationship and that therefore Salahuddin would profit if Mazzocchi were to work with Cooper.  Cooper was a Newark-based businessman who owned several concerns, including a deli, a liquor store, and S. Cooper Brothers Trucking.  In 2004, Salahuddin loaned Cooper money for Cooper to secure a bond so that he could be eligible for a garbage contract from the City of Irvington.  Salahuddin served as a general indemnitor for the bond.  In addition, Salahuddin provided Cooper with money for litigation and business expenses.  Cooper described Salahuddin as a "silent partner" in his trucking business and Salahuddin explained to Mazzocchi that he and Cooper "did business together" and also referred to Cooper as his partner.

In addition to providing Cooper with subcontracts related to Newark demolition projects, Salahuddin asked Mazzocchi to contribute to several causes in order to enable Salahuddin to direct work to Mazzocchi.  Despite Salahuddin's contrary suggestions to Mazzocchi, Salahuddin

---

[1] Mazzocchi agreed to work with the F.B.I. in April 2006, in order to avoid prosecution for bribery of multiple public officials and tax-evasion.  9/14/2011 Trial Tr., 75-76.

had no actual authority to award demolition contracts.  Later in the course of the conspiracy,

Salahuddin suggested that Mazzocchi make these contributions as a means to help Salahuddin

influence the officials who did have power over the contracts.  These contributions included a

$5,000 donation by Mazzocchi to Newark Now, a non-profit organization associated with

Newark Mayor, Cory Booker; $3,000 to purchase a table at a fundraiser for Mayor Booker; and

$4,000 in donations by Mazzocchi for Empower Newark, a Newark-based political action

committee.

Based on these dealings and the conversations recorded by Mazzocchi, the Government

brought charges against Salahuddin and Cooper.  On February 18, 2010, a grand jury in Trenton,

New Jersey, returned a five-count indictment against Defendants.  Count One charged

Defendants with a conspiracy to obstruct interstate commerce by extortion under color of official

right in violation of 18 U.S.C. § 1951(a), also known as the Hobbs Act.  Count Two charged

Defendants knowingly and willfully attempted to obstruct interstate commerce by extortion

under the color of official right, in violation of 18 U.S.C. § 1951(a) and 18 U.S.C. § 2.  Counts

Three through Five charged violations of 18 U.S.C. § 666(a)(B) and 18 U.S.C. § 2, in that

Defendants knowingly and corruptly solicited, demanded, accepted, and agreed to accept as

bribes things of value to influence and reward Salahuddin's effort to steer Newark demolition

contracts from the City of Newark to Mazzocchi and Cooper.  In particular, Count Three related

to contracts Cooper received, Count Four related to contributions Mazzocchi made at

Salahuddin's behest, and Count Five related to a $5,000 payment that Cooper made to

Salahuddin contemporaneously with being paid by Mazzocchi.  Salahuddin was charged in all

counts of the indictment; Cooper was charged in all Counts, except Count Four.  Trial began on

September 7, 2011, during which the Government introduced a number of recorded

conversations, significant documentary evidence, and testimony from Mazzocchi as well as several Newark officials.  After the Government rested, Salahuddin called several character witnesses and also testified himself.  Cooper did not call any witnesses, but did examine Salahuddin.  Closing arguments lasted several days.  On October 14, 2011, the jury returned its verdict and Defendants were convicted only on Count One, that they conspired to violate the Hobbs Act.

Defendants now move the Court to enter an acquittal or to vacate the conviction and order a new trial.

## II.    LEGAL STANDARD

### a.   Rule 29 Motion for Acquittal

According to Rule 29(a) of the Federal Rules of Criminal Procedure, "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  A court may reserve its decision on a Rule 29 motion until after the jury has reached a verdict.  If so, the court still must decide the motion on the basis of the evidence at the time the ruling was reserved.  United States v. Brodie, 403 F.3d 123, 133 (3d Cir. 2005); United States v. Claxton, 2012 U.S. App. LEXIS 13969, *11-12 (3d Cir. July 9, 2012).  Hence, this Court must decide Defendants' Rule 29 motions based on the evidence at the end of the Government's case in chief, see Brodie, 403 F.3d at 134, and their renewed motion at the end of the trial based on all evidence entered.

A  Rule 29 motion requires a court to determine whether the government's evidence is sufficient, or stated another way, whether the record contains "substantial evidence from which any rational trier-of-fact could find guilt beyond a reasonable doubt."  United States v. Lore, 430

F.3d 190, 203-04 (3d Cir. 2005); United States v. Smith, 294 F.3d 473, 476 (3d Cir. 2002);

United States v. Wolfe, 245 F.3d 257, 261 (3d Cir. 2001).  In weighing the evidence presented,

the court must "review the record in the light most favorable to the prosecution," resolving all

credibility determinations in the government's favor.  Wolfe, 245 F.3d at 261; see also United

States v. Leon, 739 F.2d 885, 891 (3d Cir. 1984) (court must look at the evidence presented by

the Government taken as a whole).

Indeed, "[c]ourts must be ever vigilant in the context of Fed. R. Crim. P 29 not to usurp

the role of the jury by weighing credibility and assigning weight to the evidence, or by

substituting its judgment for that of the jury."  Brodie, 403 F.3d at 133 (citations omitted);

United States v. Carmichael, 269 F. Supp. 2d 588, 595 (D.N.J. 2003) ("The defendant must also

overcome the jury's special province in evaluating witness credibility and conflicting

testimony.").  A finding that the government's evidence is insufficient is reserved to those

exceptional "cases where the prosecution's failure is clear," making "[t]he burden on a defendant

who raises a challenge to the sufficiency of the evidence…extremely high."  Smith, 294 F.3d at

476 (discussing post-trial Rule 29 motion); United States v. Serafini, 233 F.3d 758, 770 (3d Cir.

2000) (same).  The Court is obligated to "'draw all reasonable inferences in favor of the jury's

verdict.'"  Smith, 294 F.3d at 476 (quoting United States v. Anderskow, 88 F.3d 245, 251 (3d Cir.

1996)).

### b.   Rule 33 Motion for a New Trial

Federal Rule of Criminal Procedure 33 provides that "[u]pon the defendant's motion, the

court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R.

Crim. P. 33.  The authority to grant a new trial pursuant to Rule 33 is limited to those instances

where the Court "believes that there is a serious danger that a miscarriage of justice has

occurred-that is, that an innocent person has been convicted." United States v. Johnson, 302 F.3d 139, 150 (3d Cir. 2002) (internal citations and quotations omitted); United States v. Silveus, 542 F.3d 993, 1004-05, (3d Cir. 2008).  Even in those cases where the court may feel that the verdict is contrary to the weight of the evidence, "[m]otions for a new trial based on the weight of the evidence are not favored" and should be limited to "exceptional cases." Silveus, 542 F.3d at 1005 (quoting Government of Virgin Islands v. Derricks, 810 F.2d 50, 55 (3d Cir. 1987)). Yet if there is a reasonable possibility that a "trial error had a substantial influence on the verdict," a new trial must be granted.  United States v. Mastro, 570 F. Supp. 1388, 1390 (E.D. Pa. 1983); Government of Virgin Islands v. Bedford, 671 F.2d 758, 762 (3d Cir. 1982)).

Defendants make a number of other arguments besides challenging the sufficiency of the evidence under Rules 29 and 33.  These alleged errors must meet the same Rule 33 standard of Defendants showing that any such errors had a "substantial influence on the verdict" in order for me to grant a new trial.

## III.    DISCUSSION

Defendants were convicted of conspiring to violate the Hobbs Act, 18 U.S.C. § 1951.  In particular, § 1951(a) provides:

> Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

Relevant for this case, § 1951(b)(2) defines "extortion" as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under *color of official right*."  18 U.S.C. § 1951(b)(2) (emphasis added); see also United States v. Driggs, 823 F.2d 52, 54 (3d Cir. 1987) ("The essential elements that the government

must prove are that the defendant obstructed, delayed or affected commerce or attempted to do so; by extortion ('the obtaining of property from another, with his consent…under color of official right'); and that the defendant acted knowingly and willfully.").  To prove the elements of the conspiracy, the Government had to show as to each Defendant that: (1) he knowingly or intentionally agreed to commit extortion under color of official right that potentially could have affected interstate commerce; (2) he was a party to that agreement; and (3) he entered into it knowing of the objective, and entered into it with unity of purpose with at least one other alleged conspirator to achieve the objective, in this instance violating the Hobbs Act as described above. United States v. Rankin, 870 F.2d 109, 113 (3d Cir. 1989); United States v. Shoup, 608 F.2d 950, 956 (3d Cir. 1979); United States v. Uzzolino, 651 F.2d 207, 214 (3d Cir. 1981); United States v. Small, 472 F.2d 818, 819 (3d Cir. 1971).

### a.  Sufficient Evidence Supported the Jury's Verdict

At trial, Defendants made Rule 29 motions at the end of the Government's case-in-chief and at the end of the trial.  Alternatively, Defendants argue in their brief that the jury's verdict is against the weight of the evidence and a new trial must be granted.  The Government sought to prove the underlying elements of the conspiracy by showing that Salahuddin and Cooper intended to use Salahuddin's official power, directly or indirectly, to award contracts to Mazzocchi in exchange for an agreement to provide some subcontracting work to S. Cooper Brothers Trucking, a company in which Salahuddin had a silent and significant interest, and to seek political contributions from Mazzocchi in exchange for an explicit promise to influence other Newark officials.  Then the Government sought to prove the conspiracy by showing that Salahuddin with Mazzocchi originated the plan with full knowledge of its purpose and that Cooper willfully joined with a unity of purpose and both took steps to achieve the desired ends.

Cooper argues the evidence was insufficient to demonstrate (1) the existence of any such agreement; (2) that he was a member of any such agreement; or (3) that he had the requisite intent.  Cooper Br. at 8.  Salahuddin does not explicitly make these same factually based arguments and instead focuses on supposed legal inconsistencies in the jury's verdict that the Court addresses in turn.  But because both parties moved at trial for acquittal based on an insufficiency of the evidence, and move now for a new trial, the Court will treat these arguments as applicable to both parties.

The Court presided over thirteen days of testimony and the introduction of thousands of pages of evidence by the Government, and has reviewed the transcripts and evidence at length. After its exhaustive review, the Court finds that the evidence substantially supports the jury's verdict that such a conspiracy existed.  Perhaps most vital to the Government's case were recordings of Defendants' conversations during the formation and course of this conspiracy. These recordings were made by Mazzocchi while participating in in-person meetings and telephone calls with Defendants.  Although a reasonable person could conceivably ascribe more than one meaning to a number of the conversations, they nonetheless support the Government's theory, and a reasonable jury could so find.  For example, the Government argues the conspiracy began in July 2006, after a meeting between Parlavecchio and Salahuddin.  Recorded conversations between Mazzocchi and Parlavecchio, whom Mazzocchi had retained as a consultant in order to help him obtain more Newark contracts (9/9/2011 Trial Tr. at 209), reveal Mazzocchi and Parlavecchio alluding to an agreement concerning Salahuddin:

> Joseph Parlavecchio: That's fine, that's fine. Alright, I met with the mayor. I met with the deputy mayor [Salahuddin]. And I'm gonna meet with you, him, and the deputy. There's only one little thing. We gotta give, throw, and I know you're doing it already. You got Cooper, you got a couple of boxes on one of your jobs, whatever else. We'll give Cooper a little bit once in a while-- a machine we'll meet with Sonnie -- that's all they want they want a black guy involved. So, I'll

set up the meeting for this week with us. Alright?

Nicholas Mazzocchi: You mean, give, sub Cooper a little work?

JP: Yeah, I gotta give him a machine ahh, he doesn't have any fucking machines.

NM: Yeah, yeah.

T-3029-1 3:2-3:13. What is clear is that Parlavecchio met with Salahuddin and that Parlavecchio related to Mazzocchi that in order for Mazzocchi to receive contracts from Newark he had to give Cooper subcontracting work. Beyond this, Defendants argue the conversation should be interpreted as showing that Mayor Booker and Salahuddin were merely advocating for minority business participation rather than, as argued by the Government, that in order to obtain contracts, Mazzocchi would have to agree to provide work to Cooper, who was financially entangled with Salahuddin and that when Parlavecchio spoke about this arrangement he was referring to a separate conversation between Salahuddin and himself.[2] The jury apparently chose to believe the latter interpretation, which is consistent with other statements made within that conversation and another that took place shortly thereafter on August 6, 2006, between Parlavecchio and Mazzocchi:

JP: I'll try and set up that lunch on Thursday or so. We should be back in business.

NM: Yeah, Thursday'll be all right with me.

JP: (UI).

NM: Who are we meeting with? Cory's um--

JP: His Deputy Mayor.

NM: The Deputy Mayor.

---

[2] Mayor Booker testified that Salahuddin had no responsibilities related to demolition and that he did not know of any arrangement regarding Cooper nor did he know that Cooper operated a demolition business. 9/20/2011 Trial Tr. at 74-78.

JP: I know he's an ass, but he gives us work. You know give Cooper a couple of boxes or whatever else. They're worried about the Shine.

NM: (UI) yeah that's not a problem.

JP: That's cheap, their cheap.

NM: What's he want Joe?

JP: Who?

NM: This guy, ah, the Deputy Mayor?

JP: Nothing. You know, I'm already in, your in, I mean, you know, we made our (UI), he wants to help Cooper out. Now Cooper transitioned nice from fucking Sharpe, to this guy. For what reason? He's a Shine.

T-3031-1 2:13-18.  Again this evidence can be interpreted to support the Government's position that Salahuddin developed the conspiracy with Parlavecchio, who relayed it to Mazzocchi.  A month later, on August 24, 2006, Cooper met with Mazzocchi and Parlavecchio, and the parties again alluded to their agreement:

JP: Yeah. So, we're gonna' give whatever we get, we're gonna' give, you know, some work, be it containers, machines, whatever. Be fair.

NM: Yeah.

Sonnie Cooper: Good.

JP: But I want you to meet Nick [Mazzocchi] and--

SC: Okay.

NM: Alright.

JP: Our word's our bond.

NM: We're gonna' do good, we're gonna do good together.

JP: We get, he sends it over, you're gonna' do very well.

SC: Alright.

T-3034-2 3:8-18.

      NM: The guy that was supposed to meet us?

      JP: Ron?

      SC: Salahuddin?

      NM: Yeah.

      JP: That's [Cooper's] main man.

      NM: Okay.

      SC: Oh, (UI)

      NM: I mean--

      JP: Why do you think Ron's interested? Not because of me--

      SC: Right.

      NM: Yeah. Right.

      JP: He's interested in Sonnie.

      NM: The better he takes care of me, the better I take care of you.

      SC: Okay.

      NM: I mean I wanna' rock n' roll.

      SC: Yeah.

      NM: I ain't done nothin' in five fuckin' years, here.

      SC: Okay.

T-3034-2 3:20-4:15.  Cooper argues his role was passive, merely accepting the deal that was

offered to him.  While this is one possible interpretation, the evidence and conversations

nonetheless support an inference that Cooper had agreed to the plan and desired that it be carried

out.  Cooper never argued with the arrangement nor questioned why Mazzocchi was offering to

subcontract work to him only because Salahuddin was his "main man."  Moreover, Cooper

himself made affirmative statements and took steps to confirm the plan at a September 12, 2006,

meeting with Mazzocchi:

> NM: I'll work with you and you work with him.
>
> SC: Exactly.
>
> SC: [Salahuddin] said to me whatever we do, we have to, you know, I have to eat and he has to eat.
>
> NM: Right.
>
> SC: (UI) the other day (UI), he's gonna' be, in charge of seeing, where most, where most of the stuff go to, mostly his call (UI).
>
> NM: Right. Sonnie, I know he's gotta' be shielded. Whatever we gotta' do I do with you, and you take care of him. You know what I mean? But like they got these 200 houses, I wanna' get goin'. It's been five fuckin' years. Now, I got the contract, you know—
>
> * * *
>
> SC: Look, we've been together long. You know [Salahuddin], he's the type of guy that, I mean, how many black guys I can go to, tell him I need four hundred thousand, he'll come up with it--
>
> NM: Uh huh.
>
> SC: That's our relationship.
>
> NM: So, what do you think we could do? Do you think you could do anything?
>
> SC: I could, I could say who I believe who ever meet, let me say it this way, (UI) see most of it, he said along exact same line we did. You know? (UI) hooked up with Nacirema and that's part of it (UI), he told me that.
>
> NM: Uhm hmm.
>
> SC: But he'll, he'll (UI). Whoever do best, whoever do best by me, will do, will do it.

T-3037-1 5:3-13, 6:10-20.  The jury could infer Cooper's willfulness and intent based on his

explanation to Mazzocchi that Salahuddin would award contracts to whoever can provide Cooper the most work and that both Cooper and Salahuddin expected to benefit because both "had to eat."  Soon after, on September 20, 2006, Salahuddin also met with Cooper and Mazzocchi:

> Ronald Salahuddin: It's more important to me that you two, again, I'm speaking Chinese so you understand what I'm saying--
>
> NM: Yep, yep.
>
> RS: That you two [Cooper and Mazzocchi] are like this--
>
> NM: Right.
>
> RS: Then, anybody else—
>
> \* \* \*
>
> RS: I know [Mayor Booker] wants to get the work done. I know he wants minority participation, I know he wants this, I know he wants this town cleaned up. So, that's all in our advantage. And we know the money's there.
>
> NM: Uhm hmm.
>
> RS: Two things he's not gonna' take back, quality of life which is demolition of these old, abandoned raggedy buildings and stuff, and police. So, I'm sayin' that I just want you two, okay, to be closer.
>
> NM: Uhm hmm.
>
> RS: Because, and to be very candid with you, okay? Be very honest. You know. You're in such a position to where you're doin' so much and we get some out of East Orange, we can get a little out of Newark, uh, once in a while, Irvington, nothin' out of Orange, but you're all over the state—
>
> NM: Uhm hmm.
>
> \* \* \*
>
> NM: You're gonna' help us? Are you gonna' help us? I need--
>
> RS: That's why I'm sittin' here.

NM: I know. I know. I know. I mean, I'm goin' five years I haven't done nothin', so--

RS: That's why I'm sittin' here.

NM: Okay. So--

RS: It's enough to where, now--

NM: So long as Sonnie's happy, you're happy. That's all there is to it. That's it. Cause all I gotta' do is feed Sonnie.

SC: Yeah.

RS: (UI) not only that--

NM: Yeah.

RS: Yeah, let me finish. So, that's what I'm saying

NM: Okay.

RS: Okay? Uhm, I'm gonna, you, you will not be shut out.

NM: Okay.

RS: Let's put it that way.

NM: Okay.

RS: Okay? I don't know, I don't know why you, I don't know about all that.

NM: Uhm hmm.

RS: That was an old administration. This is a new administration.

NM: Right.

RS: Okay? Uhm, as far as uhm, demolition and all that stuff, he lets me deal with that.

NM: Okay.

* * *

RS: So I mean, I know I'm sayin', I've been talkin' circuitous but, you understand?

> NM: Yep.
>
> RS: So, all I want you to do is, you know, help [Cooper], you know, feed him, not a salad, you know, sometimes a man gotta' have steak--
>
> SC: Exactly.

T-3040-2, 6:3-8; 7:20-8:10; 9:11-12:16.  The references to Mazzocchi and Cooper being tightly connected, to the availability of funds for demolition contracts, to Mazzocchi helping Cooper and Mazzocchi not being shut out, to Cooper eating, and to Salahuddin managing demolition contracts all support the Government's theory.  There are numerous similar references throughout this September 20, 2006, conversation.  Id. at 16:19-17:6; 18:15-19:4; T-3040-3, 2:3-10.  Moreover, immediately after this conversation—only one day later—Mazzocchi called Cooper and gave him a private demolition job even though Mazzocchi apparently had someone else scheduled to do it.  T-3041 2:1-3:12 ("NM: Alright and we, we need it done right away.  They had another guy scheduled to do it…I got rid of him.").  The parties originally agreed to $13,000 for the job despite Mazzocchi thinking this was higher than expected.  Id.; T-3042-B 2:16-3:4 ("SC: Okay.  I, I figure around thirteen [thousand dollars] for it.  Can I get around thirteen for it? * * * NM: Alright, alright, alright.  That's a little bit more but it's for you, I don't care.").  Then on September 28, 2006, Cooper asked for more money for the job, and Mazzocchi agreed, this time for $16,000.  T-3042C 2:14-3:11.[3]  On October 6, 2006, Salahuddin told Mazzocchi that he appreciated the work that was given to Cooper and discussed future city demolition projects that Mazzocchi might be able to obtain.  T-3043 4:19-5:23.  Soon after, Salahuddin also assisted Mazzocchi in the collection of money he was owed by the City of Newark for past projects.  Id. at 2:21-4:7; T-3046-A 2:19-6:20; T-3046-B 2:7-3:3.

Salahuddin and Cooper continued to meet with Mazzocchi and continued to reference

---

[3] Eventually Cooper would bill Mazzocchi for $22,000.  Gov. Ex. 601.

Salahuddin directing work to Mazzocchi in exchange for Mazzocchi subcontracting to Cooper. On October 31, 2006, the three met for lunch, during which Mazzocchi suggested that because he had given Cooper work, he was hopeful he would soon be receiving more government contracts, of which Cooper could be a part. Salahuddin seemingly agreed by means of another eating-related metaphor.

> NM: Yeah. You know what I mean? Cause that was a big, we upheld all that. We did what we were supposed to do, and uhm, you know, if we get a, could get a big piece then Sonnie can be with me, you know what I mean? That's all. You know like, maybe you say, oh, I got no problem with Mazzocchi, he (UI)--

> RS: (UI) gotta' do is, see now I can go in there with a position of strength--

> NM: Right.

> RS: He says, well, can he handle this? I'll say yes, cause he works with Nick Mazzocchi.

> NM: Okay, good. Yeah. Yeah. Right.

> RS: See now, there's no, there's no impediments now.

> NM: Right.

>  *  *  *

> RS: We're having dinner.

> NM: Right.

> RS: We don't wanna' eat the steak.

> NM: Right.

> RS: You earned the steak.

> NM: Right.

> RS: But we can eat the soup and the salad.

> NM: Right, right, right.

RS: You understand this is the way him, you understand what I'm saying?

NM: Yeah, yeah, yeah.

RS: No one's looking for, you understand what I'm saying?

NM: Right.

RS: You, you--

SC: Yeah.

RS: You gotta' be the pilot. You gotta be the pilot.

NM: Alright. Okay.

RS: You earned the pilot's spot.

NM: Okay.

RS: We just wanna' be on the boat.

*  *  *

RS: But out of those four [potential contractors, including Mazzocchi], okay who, who, who you think we gonna' lean to? Without you saying it?

NM: I hope so.

RS: Yeah, the other three, I don't, I don't, I'm not sitting having lunch with.

NM: Right. I, I hope so. I mean--

RS: Well, I'm tellin' you. It's there.

T-3052-2 3:4-14; 4:8-5:4; see also T-3052-3 2:2-3:4.

RS: So, I, I have to put you in there because now I can say, hey we're able to do this and that whatever—

NM: Right. Yeah (UI).

RS: (UI), he knows you (UI)--

NM: (UI) money, you put me in there, he's with me.

> RS: That's, that's what I'm sayin'.
>
> NM: That's it. We don't need nobody else.
>
> RS: Alright, no.
>
> NM: Alright? Ronnie. I really appreciate it.
>
> RS: No. Thank you Nick.

T-3052-3 3:21-4:8; <u>see</u> <u>also</u> T-3060 5:10-6:4; T-3063 5:17-6:12.  The Government argued to the jury that Salahuddin's discussion of him and Cooper "eating" was an attempt at subtlety and confirmed the basic tenet of the arrangement that Mazzocchi could profit substantially from Newark City projects because of Salahuddin's influence and both Salahuddin and Cooper could feed off some small portion of the gains.

   Within the framework of this agreement, the Government showed that Mazzocchi was awarded several contracts, and subcontracted work to Cooper in connection with those projects, from the City of Newark, at Roseville Avenue (T-3080, T-3083, Gov't Exs. 706, 708) and Tichenor Street (T-3091, Gov't Exs. 807, 810).  Cooper gave Salahuddin a check for $5,000 shortly after he was paid for the Tichenor Street job.  Gov't Ex. 1025.  Defendants also discussed helping to direct demolition projects related to the building of the New Jersey Devils stadium to Mazzocchi so that all could profit.  During their conversations about the stadium work, Salahuddin insisted that their arrangement remain a secret, otherwise he would not be able to effectively lobby for the project:

> RS: I talked to Pablo. I wanna' deal with the city end and I wanna' deal with the Dev, the Devils. The Devils is our bigger, bigger piece, I want to get the city, ours.
>
> *  *  *
>
> RS: Nick, listen to me. This is the key. The key is if they keep it private, see, you have two entities that are partners now. We have the Devils and you have the City

of Newark. My job is to keep it private. The Devils wanna' keep it private.  If it's kept private, now they can hire anybody they want to do the work.

T-3064 3:21-4:20.  Salahuddin hoped to direct millions of dollars worth of work related to the stadium to Mazzocchi and Cooper.  T-3075 3:7-4:19 ("RS: I mean that's, that might be 5, 10 million dollars worth of road work and demolition…That's the real money.  You know.  So, just got to keep ourselves in position.").

In addition, Mazzocchi made several political contributions at Salahuddin's insistence. These included a $5,000 donation by Mazzocchi to Newark Now, a non-profit organization associated with Newark Mayor, Cory Booker (9/12/2011 Trial Tr. at 79-80; Gov't Ex. 2001); $3,000 to purchase a table at a fundraiser for Mayor Booker (T-3091-2 7-9); and $4,000 in donations by Mazzocchi for Empower Newark, a Newark-based political action committee (9/20/2011 Trial Tr. at 107-108; Gov't Exs. 2004, 2005, 2006, 2008; T-3064 10:6-10).  When Mazzocchi discussed these donations with Salahuddin, Salahuddin suggested the donations were made in furtherance of the conspiracy so that everyone could "eat"

> RS: You see, this now, okay, when Mazzocchi name's comes up when the demolition comes up--
>
> NM: Hmm.
>
> RS: I've already, listen. I already told--
>
> NM: Yeah, uhm hmm.
>
> RS: Pablo.
>
> NM: Uhm hmm.
>
> RS: Okay? He's the, he's the Chief of Staff.
>
> NM: Yep.
>
> RS: And I hand him this, you know with mine and Sonnie's, its locked in--

NM: Yeah. And I, and I got no problem doin' more but I gotta' eat.

RS: No, no, no, no, no--

NM: But you understand what I'm saying?

RS: Let me say something to you--

NM: If, if, if the--

RS: Let me say something to you. Let me say something to you. This was done, there won't be anymore, until we all eat. Including Sonnie.

NM: Um hmm. Yeah. Okay. Okay.

RS: Okay? I mean this is not, you know--

NM: Right.

RS: List, feed me and I'll, I'll, I'll--

NM: Right.

RS: Appreciate the food. I can't keep--

NM: You're exactly right. That's, that's what I mean.

RS: I can't tell you.

NM: That's what I mean.

RS: Feed.

T-3066-2 4:16-5:20.  The jury could understand from this conversation that if everyone wanted to profit, including Cooper, then Mazzocchi had to make the donations so that Salahuddin could influence the contracting process.

The Court could continue in this fashion for many pages.  This only represents a sample of the Government's evidence presented to the jury.  Considered singly, each snippet of conversation may not be convincing, but, as a whole, the totality of the evidence firmly supports the jury verdict.  Salahuddin's statements about directing contracts to Mazzocchi, all parties

mentioning Salahuddin and Cooper "eating" or "being taken care of," Cooper discussing that whomever takes the best care of him will be taken care of by Salahuddin, Salahuddin and Cooper describing each other as "partners," Salahuddin's financial interest in Cooper Brothers Trucking, and Salahuddin soliciting Mazzocchi for political contributions in order to help direct demolition contracts to Mazzocchi all suggest a conspiracy willfully entered into by Salahuddin and Cooper where both intended Salahuddin to use his official capacity to direct projects to Mazzocchi if in turn Mazzocchi would share that work with Cooper so that both Cooper and Salahuddin could profit.

Defendants' initial Rule 29 motion was made at the end of the Government's case-in-chief and the Court reserved judgment until after the jury reached a verdict. Therefore, I must rule on Defendants' motion first based on the evidence at the end of the Government's case. Brodie, 403 F.3d at 134. The evidence discussed above was introduced to the jury during the Government's case; this included the 78 recorded conversations and corroborating support of physical, documentary, and testamentary evidence from Newark officials and Mazzocchi. Based on this evidence, and reviewing it in a light favorable to the prosecution, the Court finds there is substantial evidence from which any rational trier-of-fact could have found Salahuddin and Cooper guilty beyond a reasonable doubt. To hold otherwise would merely be substituting the Court's opinion for that of the jury.

As part of the Defense case, Salahuddin introduced evidence and testimony intended to show that he and Cooper were not motivated by any intent to extort payment but rather by a desire to help minority businesses in Newark, such as Cooper's.[4] In particular, Salahuddin testified that his intent was not conspiratorial nor criminal, but benign and he only sought to advance the interests of minority business owners in Newark. Salahuddin did not offer evidence

---

[4] Cooper did not offer any witnesses of his own nor did he testify.

that sufficiently rebutted the Government's case or negated the Government's evidence. Rather, he offered an alternative theory on how to view that evidence. As is discussed in further detail below, it was for the jury to accept or reject that theory—to decide what Defendants' motivations were and whether they had the requisite intent to commit the crimes charged. Again, in considering a Rule 29 motion, the Court must weigh the evidence in the light most favorable to the prosecution. United States v. Silveus, 542 F.3d 993, 1002 (3d Cir. 2008). The jury accepted the Government's theory and that theory was supported by substantial evidence as discussed above. Therefore, even considering the evidence and testimony offered after the Government's case, Defendants' renewed Rule 29 motion must also be denied. Based on the evidence presented at trial, a reasonable jury could conclude beyond a reasonable doubt that Defendants conspired to violate the Hobbs Act as charged in Count One.

**b. The Jury's Verdict was Not Against the Weight of the Evidence**

Cooper offers a number of arguments why, even if his Rule 29 motions are denied, a new trial must be granted because the verdict is against the weight of the evidence under Rule 33. As stated before, this is a different standard than the Court applies to Defendants' Rule 29 motions. When a district court evaluates a Rule 33 motion it does not view the evidence favorably to the government. Silveus, 542 F.3d at 1005. Nevertheless, such motions are granted sparingly and only if the Court finds that the verdict is contrary to the weight of the evidence and that there is a serious danger that a miscarriage of justice has occurred. Id.

Cooper stresses what he views as the lack of direct evidence and argues that fact should frame the Court's review of the record. Cooper is correct that the recordings are not all direct, explicit statements evidencing an illegal agreement between himself, Salahuddin, and Mazzocchi. Nevertheless, the evidence supports a finding that such an agreement existed, and

contrary to Cooper's argument, there is also substantial evidence that both Salahuddin and Cooper were aware of the unlawful nature of the agreement and intended to partake in it and share its benefits.  As shown above, the parties would often speak in metaphor, alluding to the fact that while Mazzocchi could have the main course—the steak—Salahuddin and Cooper had to eat also.  Salahuddin would repeatedly emphasize that he could not be direct and instead say that he had to speak "Chinese" or be "circuitous."  He felt confident that their agreement would be beyond reproach because Salahuddin was "not on paper."  At other times, however, Salahuddin was concerned who might be listening and the ramifications if then U.S. Attorney Chris Christie or the F.B.I. found out about their arrangement.  T-3042-2 18.  This conduct suggests that the parties were aware they were attempting to circumvent normal legal methods for assigning government contracts and doing so for profit.  Therefore, the evidence substantially supports a finding that Salahuddin and Cooper joined or originated the conspiracy with an intent to extort a form of payment using Salahuddin's official power.

Nevertheless, Cooper argues that the verdict cannot stand because Mazzocchi's trial testimony was so riddled with contradictions it could not be believed and therefore must be discounted.  There is little doubt that Mazzocchi himself was an unsavory character who played "a part" in this scheme and that he had a history of illegal interactions with public officials.[5]  But Cooper's argument erroneously asserts that the Government's case rested "almost exclusively on the trial testimony of Mazzocchi and Mazzocchi's efforts to create the appearance of impropriety."  Cooper Br. at 10.  Were this assertion correct, then Cooper's argument might hold

---

[5] Cooper relies heavily on the fact that Mazzocchi agreed to cooperate with the Government in exchange for not being prosecuted for certain earlier crimes.  The jury was made very aware of Mazzocchi's agreement with the Government as well as his prior payments of bribes to public officials; the jury was free to factor these facts into its determination.  Indeed, the jury was so instructed to consider these circumstances in evaluating Mazzocchi's testimony.  It is beyond the Court's power here to find as a matter of law that Mazzocchi was biased.

more weight.  Instead, much of the evidence comes from Cooper's own statements as well as his acquiescence in what others said to him when explaining the conspiracy.  For example, at the August 24, 2006 meeting Cooper agreed that he should be given work if Mazzocchi was given work and that Cooper would "do very well."  Then, at the September 26, 2006 meeting, Cooper put this arrangement into his own words: "[Salahuddin] said to me whatever we do, we have to, you know, I have to eat and he has to eat" and that "whoever do best by me" will be rewarded.  Other times Mazzocchi would confirm the plan with Cooper and Cooper would respond approvingly.  The jury was free to conclude that when Mazzocchi said something like "all I gotta' do is feed Sonnie" and Cooper responds "Yeah" he was agreeing to the conspiracy.  It is reasonable to infer that Cooper's agreement with Mazzocchi is proof of the agreement just as is Mazzocchi's explicit statement.  These few instances are examples of what is replete throughout the recorded conversations—either Cooper agreeing with the contours of the conspiracy or explicitly explaining it to Mazzocchi.  Cooper was not alone in this; Salahuddin also discussed and reiterated the plan—indeed, far more often than Cooper.

Along these lines, Cooper argues that the "Defendants' conduct was entirely innocent" and "they never responded to Mazzocchi's veiled attempts to make an arrangement."  Cooper Br. at 12.  As shown above, this is not accurate.  Both Cooper and Salahuddin met with Mazzocchi, outlined the arrangement in their own words, and agreed with Mazzocchi when he did likewise. After Mazzocchi gave Cooper some work, one day after meeting with Salahuddin, then Salahuddin repeated that he appreciated it and worked to get Mazzocchi money that the city owed him as well as more contracts.  Cooper took this work, even continued to ask for more money for it, although he knew it had already been offered to someone else.  This substantially supports a finding that Defendants confirmed the conspiracy with both their words and their

actions.

Even if Mazzocchi's testimony was foundational to the verdict, the jury was free to believe those portions that supported the Government's case.   Many of Mazzocchi's testimonial "inconsistencies" that Cooper points to either sprout from misunderstandings between the pointed questions of counsel or are irrelevant to the substantive issues involved in this matter. For example, Cooper juxtaposes Mazzocchi's testimony regarding whether Mazzocchi had committed illegal bribes in the past.   The thrust of this testimony is that in his earlier dealings Mazzocchi believed that agreeing to a "shakedown" was not illegal to acquire business, but he now understands that it was an illegal bribe.   Cooper suggests that Mazzocchi always knew it was illegal and that his inconsistent testimony is proof that he is lying.   There is no doubt that Mazzocchi was attempting to minimize his prior misdeeds and that his claimed epiphany about the illegality of those actions at trial lacked credulity.   Nevertheless, whether or not Mazzocchi thought his conduct prior to being involved with Defendants was illegal is immaterial to the issues before the Court today.   Defendants' counsel each pressed him on these points and suggested to the jury that Mazzocchi was lying; the jury was free to discount his testimony or accept it in whole or in part.   It is centrally their province to act as fact finder and judge the witness's credibility.   Moreover, no one knows what portion, if any, of Mazzocchi's testimony the jury relied upon, because the jury also had the tapes of the conversations between Mazzocchi, Salahuddin, and Cooper.   Whether or not the jury agreed with Defendants' characterization of Mazzocchi as a witness who could not be trusted is not a basis to overturn the conviction or grant a new trial.

Another supposed inconsistency is whether Mazzocchi was being truthful in his testimony regarding how he initially met Cooper.   Defendants argue that Mazzocchi originally

26

testified he met Cooper through Salahuddin and then reversed himself, saying he met him through Parlavecchio.  Aside from the issue of whether this is even relevant to the substantive issues at hand, a review of the transcript and the recordings show there is no actual inconsistency.  Mazzocchi only met Cooper because he believed that if he wanted to do business through Salahuddin he had to give business to Cooper.  And it was through Parlavecchio that Mazzocchi learned of this arrangement.  See T-3034-1 – T-3034-4.  This does not preclude Mazzocchi's testimony that he met Cooper through Salahuddin's insistence, even though he learned of that insistence through Parlavecchio.

Cooper also argues that because Mazzocchi had prior experience bribing public officials, he would have obtained specific terms from Salahuddin and Cooper instead of talking "Chinese" as Defendants put it or discussing how Salahuddin and Cooper wanted to eat a portion of what Mazzocchi was being fed.  But the jury could have inferred this obfuscation to be purposeful, designed by Defendants to avoid the very issue that Cooper raises: preventing the terms from being made so clear that a conviction could be easily had.  This is further supported by the fact that Salahuddin and Cooper spoke in metaphors, Salahuddin was concerned about others discovering the arrangement, or other times lauded the fact that he was "not on paper."

Along these lines, Cooper contends that it was a failure of proof for the Government not to establish an explicit "payment term and concealment term" through testimony or the recorded conversations.  In other words, Cooper complains about the relative lack of direct proof.  It is well understood that such proof is not a prerequisite for a conviction.  A conspiracy is often born of surreptitious means and is nurtured in shadow—to require direct evidence of all terms and aspects would allow conspirators to profit from their subterfuge.  "Secrecy and concealment are essential features of successful conspiracy. The more completely they are achieved, the more

successful the crime. Hence the law rightly gives room for allowing the conviction of those discovered upon showing sufficiently the essential nature of the plan and their connections with it, without requiring evidence of knowledge of all its details or of the participation of others." Blumenthal v. United States, 332 U.S. 539, 557 (1947); see also United States v. Smith, 294 F.3d 473, 476 (3d Cir. 2002) ("The existence of a conspiracy can be inferred from evidence of related facts and circumstances from which it appears as a reasonable and logical inference, that the activities of the participants . . . could not have been carried on except as the result of a preconceived scheme or common understanding.") (quoting United States v. Gibbs, 190 F.3d 188, 197 (3d Cir. 1999); Brodie, 403 F.3d at 134.  The jury was free to infer that the statements about Mazzocchi giving work to Cooper or about Mazzocchi supporting certain causes suggested by Salahuddin constituted the "payment term."  Moreover, it was not necessary for Defendants to receive monetary payment; in the context of the Hobbs Act, payment includes both tangible and intangible property, such as Mazzocchi's promise to provide subcontract work to Cooper or provide payments to causes supported by Salahuddin.  See Scheidler v. Nat'l Org. of Women, Inc., 537 U.S. 393, 402 (2003).

Cooper also argues that any payment he received was only for work he performed.  This may be true, but that does not affect the jury's verdict or how the Court should interpret the evidence.  The issue is not how much Cooper was paid for his work, but how he received the work in the first place.  It is immaterial that Mazzocchi paid Cooper for the subcontracted work. The jury could infer from the evidence that Mazzocchi gave Cooper work at Salahuddin's and Cooper's insistence and in exchange for Salahuddin's promise to assign more city contracts to Mazzocchi.  Direct evidence established that Mazzocchi gave Cooper work that he had already

allocated for someone else.[6]  This pattern was repeated as Mazzocchi was awarded other Newark demolition work.  In February 2007, Salahuddin promised to speak to Elyze Minter ("Minter"), Newark's Director of Demolition, to get Mazzocchi "some hits."  T-3080-3 at 3.  Salahuddin believed he could influence Minter's decision making process.  Then on February 27, 2007, Newark gave Mazzocchi a contract for demolition work on Roseville Avenue.  Mazzocchi subcontracted to Cooper, who received $2,900.  Then in April, Mazzocchi was awarded a demolition contract for a building on Tichenor Street.  Mazzocchi again subcontracted work to Cooper and paid him $5,029—a check that was sent to Cooper via Salahuddin.  It was reasonable for the jury to find that but for the agreement between Defendants and Mazzocchi to use Salahuddin's influence, Mazzocchi would not have subcontracted with Cooper.  That was the essence of the Government's case and it was supported by substantial evidence.

In connection with these contracts, Cooper points to Salahuddin's statements from February 27, 2007, and argues no conspiracy existed because Salahuddin said that Mazzocchi did not have to use Cooper for a job.  What Salahuddin actually said was that Mazzocchi did not have to use Cooper "on this one" because Salahuddin and Cooper had "got a lot of stuff."  Nevertheless, Mazzocchi said that he would give Cooper some work and Salahuddin responded that he appreciated it.  In particular:

> NM: Okay, and um, how about that what do you want me to do with Sonnie?
>
> RS: No, no, no don't worry about that, that, that's not, you know, that, we got we got a lot of stuff to do that's you, just, ah, you know don't, don't worry about that. Just do what you gotta do.
>
> NM: Alright.
>
> RS: If you got, have you got, have you got something for him and you want to give him take the stuff out or whatever, whatever you, if you can do something

---

[6] Potentially belying Cooper's argument is that Mazzocchi paid Cooper substantially more than he thought was fair, which Cooper accepted without question.

for him you can, you can, if you don't, on this one don't worry about it, but if you can --

NM: No, I can, I can, I can, um, ah, should I call him or you want to call him and send me a truck?

RS: Yeah, no you, you call him and just tell him what you need, what to send you.

NM: Okay.

RS: I'll just call him and tell, I'll just call him and tell him that you're gonna, you're gonna call him.

NM: Alright, I appreciate it Ronnie.

RS: I appreciate you too okay.

T-3083D at 3:3-18. This could be understood in one of two ways: either disputing the Government's theory that Cooper's involvement was part of an illicit extortion scheme or supporting that theory because Salahuddin responded that not using Cooper this one time would be a potential exception because Salahuddin and Cooper were both busy, yet he nevertheless approved of and appreciated Mazzocchi giving Cooper work as part of their secret arrangement. Salahuddin's use of the first-person plural when he told Mazzocchi "we got a lot of stuff" supports this inference. Even if one interpreted the conversation as Defendants wish, it falls far short of disputing the weight of all other evidence or suggesting the jury's verdict represents a serious miscarriage of justice.

Cooper also argues that Mazzocchi's relationship with Parlavecchio exculpates Defendants. In particular, (1) Cooper points to what he believes are inconsistencies with Mazzocchi's testimony about his relationship with Parlavecchio; (2) argues that Mazzocchi extricated Parlavecchio from the conspiracy so that Mazzocchi could exercise more control over Defendants' conduct; and (3) ultimately Mazzocchi himself never had a firm grasp on the contours of the conspiracy because one never truly existed. It is not clear how these points are

related or how they suggest that Defendants are innocent.  What is clear is that the evidence supports finding Salahuddin and Cooper guilty of conspiracy irrespective of Parlavecchio's role. The recorded conversations show that even if Parlavecchio first introduced Mazzocchi to Salahuddin and Cooper, at some point Parlavecchio's involvement was minimized and kept separate from the vast majority of interactions between Mazzocchi, Salahuddin, and Cooper.  On several occasions Parlavecchio chastised Mazzocchi for trying to develop a relationship with Salahuddin without him and Mazzocchi asked Salahuddin and Cooper both not to discuss their arrangement with Parlavecchio.  No matter the motive or the potentially improper relationship between Mazzocchi and Parlavecchio, this does not absolve Salahuddin and Cooper of their separate involvement with Mazzocchi nor does it belie the Government's evidence of the conspiracy.

In support of his argument that he lacked intent, Cooper argues that he made no attempt to conceal his relationship with Mazzocchi and points to the fact that he was willing to accept a check rather than cash for the Roseville Avenue job.  Cooper Br. at 32.  As discussed above, the thrust of the Government's case was not that Cooper had to hide the fact that he obtained work through Mazzocchi, but that he had to hide *how he obtained that work*.  If anything, the conversation cited by Cooper implies that he at least had knowledge of the conspiracy and its objective because it suggests he knew there was a reason to want to hide the arrangement.  In particular, after Mazzocchi asked him about the form of payment and Cooper responded "It don't make no difference," Mazzocchi pressed and asked:

NM: You know what I mean? Cause I know, I know, you're—

SC: Right, right.

NM: You know, maybe that helps you out with Ronnie--

SC: Okay.

11 NM: Or somethin' like that--

12 SC: Okay.

13 NM: You know what I mean? I'll give you cash. You know what--

14 SC: Okay.

15 NM: I wanna' do the right thing, Sonnie.

16 SC: Okay.

T-3085 at 4:7-16.  The recorded conversations showed that Cooper was a man of few words, often responding "okay," but the jury could have concluded that if there was no underlying impropriety, then Cooper would have been more flummoxed by this conversation, incredulous at Mazzocchi's concerns that paying in cash helped out Cooper and Salahuddin because that was the "right thing" to do.  Therefore, the jury could have concluded that this evidence supported the existence of the conspiracy alleged by the Government, especially in the context of the other recorded conversations.

Similarly, the fact that Salahuddin did not conceal his attempts to lobby for Mazzocchi is unavailing to Defendants' theory.  According to Mayor Booker's testimony, Salahuddin had no actual authority to unilaterally award demolition contracts.  9/20/2011 Trial Tr. at 74.  Rather, Salahuddin had to work through other officials and agencies.  Therefore, in order for the arrangement to work, he had to openly lobby for Mazzocchi.  Hiding his financial relationship with Cooper then would allow him to lobby more effectively as did asking Mazzocchi to contribute to certain political causes.  This allowed Salahuddin to approach officials, such as Minter who had the actual authority to award demolition contracts, and say that Mazzocchi was a "friend of the administration."  Minter testified that he only awarded contracts to Mazzocchi

32

because Salahuddin made such representations:

> Q. What was your understanding as to why Deputy Mayor Salahuddin was telling you that Fiore was not a friend of the administration and Mazzocchi was a friend of the administration?

> A. As I indicated, I got the impression that the work that I had been giving to Teddy Fiore, that I should give to Mazzocchi.

9/21/2011 Trial Tr. at 25:13-19. Further, it is immaterial that Salahuddin did not have actual power to award contracts as he suggested to Mazzocchi. A public official does not necessarily need to possess the power to do what he is promising. It is enough that a payment is made or a benefit is conferred in hopes that it will influence the official in the exercise of his office and if the official accepts the payment or benefit with that understanding. United States v. Antico, 275 F.3d 245, 258 (3d Cir. 2001) ("The Hobbs Act simply states that use of one's office to obtain money or services not due is extortion."); United States v. Mazzei, 521 F.2d 639, 643 (3d Cir. 1975) (stating that a jury need not find a public official had "actual *de jure* power" to do what he promised).

Next, Cooper argues there was neither an improper, nor any, business relationship between himself and Salahuddin and further, that there was no evidence to support that Mazzocchi subtracting to Cooper was a means to pay off Salahuddin. The Court agrees that while some of the evidence can be interpreted to support Cooper's position, it was for the jury to decide this issue, and the Government introduced substantial evidence to find there was a concealed relationship between Salahuddin and Cooper and that they designed this scheme so that they both could profit. Salahuddin had provided significant financial support for Cooper's business in 2004, when he mortgaged property to give Cooper a loan so that Cooper could obtain a bond (Exs. 307, 309, 1008A), Salahuddin served as a general indemnitor for the bond (Ex. 306), and provided money for expenses (Exs. 1005, 1007). The recorded conversations also

repeatedly demonstrated that Salahuddin and Cooper saw themselves as a single unit.  For example, on March 8, 2007, Salahuddin and Mazzocchi had a telephone conversation in which Salahuddin was lamenting that Cooper's Liquor Store was going to be investigated by Newark's Alcohol Beverage Control.  Because of Salahuddin's position as head of a related task force, he explained to Mazzocchi that he had to allow the investigation to proceed otherwise people would be suspicious because "I do business with the guy." T-3084 at 5.  Later in the same conversation, he referred to Cooper as his "partner." Id. at 6 ("I'm in charge of the task force and I gotta' close down my own partner.").  Similarly, Cooper informed his bond broker, Philip Tobey, that Salahuddin was his "silent partner." Ex. 311; 09/09/2011 Trial Tr. at 161-162.  Moreover, on September 20, 2006, when Salahuddin met with Mazzocchi in person and discussed his arrangement with Cooper, Salahuddin said that "Sometimes you can't say everything [because] you never know who's listening." T-3040-2 at 17:17-19.  Nevertheless, he expressed confidence that even if he were being investigated by the U.S. Attorney's Office, he was not "on paper" further suggesting his relationship with Cooper was secret.  This is what was said:

> RS: Me, you know, Chris Christie, the Attorney General will be looking at me--
>
> NM: Yeah, you gotta' stay clean.
>
> RS: I ain't got a connection to anything.
>
> NM: You gotta stay clean.
>
> RS: You see? So--
>
> NM: They look at you just because you're friends with him [Cooper]?
>
> RS: Oh yeah. Yeah. But the good thing about this, I'm not on paper anywhere, no son, no girlfriend, no wife, no nothin'.

Id. at 18:15-22.  As the Government pointed out at trial, neither Cooper nor Salahuddin disclosed

their financial involvements with each other to Newark officials. Perhaps most telling is that in their recorded conversations, Salahuddin and Cooper often invoked "we" when referring to any benefits that were to flow to Cooper. While Salahuddin tried to explain at trial that he meant only Cooper, the jury was free to discount his testimony. Cooper dismisses this as merely "Salahuddin's pompous, vague innuendoes." Cooper Br. at 5. Again, it is for the jury to decide whether that was the case or not. The evidence, therefore, substantially supports a finding that there was a significant financial relationship between Cooper and Salahuddin.

Finally, Cooper argues that because he had already received work from the city through Minter, he had no reason to join the conspiracy. Again, the jury was free to accept this reasoning, but did not need to. Substantial evidence supports the Government's theory that Cooper, through his relationship through Salahuddin, was looking for more work and did accept work from Mazzocchi. Simply because he had received work in the past, does not negate the possibility that Cooper wanted additional contracts. Such a conclusion is supported by the evidence, including the recorded conversations. Cooper explained that he was looking for people to "take care" of him and when Mazzocchi offered him work, he immediately accepted.

I do not find that the jury's guilty verdict was against the weight of the evidence or that the interests of justice require me to vacate the verdict and order a new trial. Indeed, the evidence supports the jury's finding that a conspiracy existed, that Defendants joined it, and that their involvement was willful and they intended to achieve the aims of the conspiracy, namely to use Salahuddin's purported influence to direct contracts to Mazzocchi and in turn subcontracts to Cooper. Many of Cooper's arguments are more properly made to a jury—and were made to the jury. That the jury did not accept them does not provide sufficient reason for a new trial.

### c. The Verdict Was Not Inconsistent

Salahuddin and Cooper separately argue that perceived inconsistencies in the jury's verdict require the Court to vacate the conviction.  The jury acquitted Defendants on Count Two, attempting to violate the Hobbs Act, and Counts Three through Five, the counts alleging substantive violations of the Hobbs Act.[7]  Because the dismissed counts incorporated conduct alleged in Count One, Defendants posit, albeit each in a different way, that they must then be innocent of Count One as well.  In essence, they argue that the conspiracy charge cannot stand unless the Government proved the conduct alleged in any of Counts Two through Five.

Salahuddin in particular focuses on this argument in his briefing to the Court.  He argues that a Hobbs Act conspiracy requires an overt act of agreeing to, and accepting, the benefits promised.  Salahuddin Br. at 11 ("Hence it is clear the Government must prove that defendant actually obtained the things of value set forth in the indictment.").  Accepting this as true, then Salahuddin contends acquittals on the substantive charges would by necessity require a not guilty verdict on the conspiracy charge.  Much of Salahuddin's argument is premised upon a condemnation of the concept of conspiracy generally—which is beyond the Court's power to remedy—as well as a misunderstanding of conspiracy as applied to the Hobbs Act in particular.  With denunciatory fervor, Salahuddin likens a conspiracy charge to a dangerous mythical beast that threatens the freedom of our citizenry.  Salahuddin Reply at 5.  But the evils engendered by illegal conspiracies are well discussed, and well known to courts.

> This settled principle derives from the reason of things in dealing with socially reprehensible conduct: collective criminal agreement—partnership in crime—presents a greater potential threat to the public than individual delicts. Concerted action both increases the likelihood that the criminal object will be successfully attained and decreases the probability that the individuals involved will depart from their path of criminality. Group association for criminal purposes often, if not normally, makes possible the attainment of ends more complex than those which one criminal could accomplish. Nor is the danger of a conspiratorial group limited to the particular end toward which it has embarked. Combination in crime

---

[7] As mentioned above, Cooper was not charged in Count Four.

makes more likely the commission of crimes unrelated to the original purpose for which the group was formed. In sum, the danger which a conspiracy generates is not confined to the substantive offense which is the immediate aim of the enterprise.

Callanan v. United States, 364 U.S. 587, 593-94 (1961) (discussing the Hobbs Act); see also United States v. Feola, 420 U.S. 671, 694 (1975) ("The law of conspiracy identifies the agreement to engage in a criminal venture as an event of sufficient threat to social order to permit the imposition of criminal sanctions for the agreement alone, plus an overt act in pursuit of it, regardless of whether the crime agreed upon actually is committed."); United States. v. Jannotti, 673 F.2d 578, 591 (3d Cir. 1982) ("Because an agreement between two or more persons to commit criminal acts poses, in and of itself, a serious danger to social order, it is proscribed by the law of conspiracy."). The larger the conspiracy or the less defined its aims, the more elastic its contours become, and it becomes susceptible to such stretching by the Government that courts must be wary of overreaching, of attempts to ensnare otherwise innocent conduct into the amorphous bounds of the conspiracy and its effects and consequences.  But Defendants have not shown that to be the case here.  Rather, as discussed above, the evidence supported a verdict that Defendants purposefully and directly engaged in a plan to use Salahuddin's influence as Deputy Mayor for gain.  That the jury found Defendants did not fully accomplish their goal does not in and of itself require acquittal or a new trial; there is no requirement that a Hobbs Act conspiracy can only be shown by obtaining extorted property.  To so hold would merge the conspiracy and the substantive offense into one crime.

There is a significant distinction between a substantive offense and a conspiracy to commit that substantive offense.  An unrealized conspiracy is no less criminal than a realized

conspiracy; the illegality lies chiefly in making the agreement, not in achieving its ends.  See Callanan, 364 U.S. at 593; Jannotti, 673 F.2d at 591; United States v. Hsu, 155 F.3d 189, 203 (3d Cir. 1998) ("It is thus the conspiratorial agreement itself, and not the underlying substantive acts, that forms the basis for conspiracy charges.").  But Salahuddin argues that "there must be an allegation and proof that defendants' criminal act 'crystallized,' i.e. that they agreed to accept contributions, future payments and contracts for Cooper in exchange for future political favors and that such 'crystallization' is demonstrated by defendants obtaining contributions, future payments and contracts for Cooper, which constitutes the sine qua non overt act substantiating a charge for conspiracy."  Salahuddin Br. at 11.  He cites to the Third Circuit's decision in United States v. Manzo, 636 F.3d 56 (3d Cir. 2011), for support.  Nowhere in that opinion did the court hold or suggest that a Hobbs Act conspiracy charge (or the intent element of such a charge) requires proof that a defendant obtained property.  What Defendant quotes from is a portion of the Manzo opinion where the Third Circuit is restating the Government's position that the defendant's intent "crystallized" when he agreed to accept payment in exchange for favors.  Id. at 66.  It is not a holding or rule of law, as suggested by Salahuddin, nor does it address whether a conspiracy charge requires a defendant to have obtained contributions or payment.  Rather, it addresses how a defendant's intent can be proven.  Here, too, Salahuddin's intent to join the conspiracy could have been said to crystallize when he agreed to accept payment, i.e. Mazzocchi subcontracting to Cooper, in exchange for favors.  Salahuddin also quotes from Manzo for the proposition that the Government must prove that Defendants received "a thing of value" in order to sustain the conviction.  But counsel neglects to inform the Court that this quote is regarding an attempt charge and that the Manzo Court nowhere held or suggested that a conviction for attempt, let alone conspiracy, requires proof that Defendants actually obtained a thing of value.

Rather, the full quoted language reads:

> An attempt conviction requires evidence that the defendants (1) acted with the requisite intent to violate the statute, and (2) performed an act that, under the circumstances as they believe them to be, constituted a substantial step in the commission of the crime.

Id. (internal edits and quotation omitted).

Salahuddin also relies on United States v. Jannotti, 673 F.2d 578 (3d Cir. 1982), for the same proposition.  There, the Third Circuit discussed the jurisdictional requirements of the Hobbs Act and whether the alleged conduct affected interstate commerce.[8]  The Jannotti Court explained, quite succinctly, that a conspiracy to violate the Hobbs Act is not the same as the substantive offense of violating the Hobbs Act and one can prove a conspiracy without conduct actually affecting interstate commerce.  Id. at 591 ("In so arguing, defendants overlook the significant distinction between a conviction for a substantive offense and a conviction for a conspiracy to commit the substantive offense."); Hsu, 155 F.3d at 203 ("The impossibility of achieving the goal of a conspiracy is irrelevant to the crime itself.").

Generally a conspiracy requires the commission of an overt act.  In part, this serves to corroborate the conspirators' intent and to show that their criminal enterprise had proceeded past mere conjecture.  Contrary to Defendants' position, an overt act does not require, however, that the aims of the conspiracy be completed.  Indeed, some case law holds that no overt act is required for a Hobbs Act conspiracy.  United States v. Palmer, 203 F.3d 55, 63-64 (1st Cir. 2000) ("Evidence of an overt act is not required to establish a Hobbs Act conspiracy."); United States v. Pistone, 177 F.3d 957, 960 (11th Cir. 1999); Ladner v. United States, 168 F.2d 771, 773 (5th Cir. 1948) (conspiracy to interfere with interstate commerce "does not require an overt act to complete the offense"); United States v. Facciolo, 753 F. Supp. 449, 451 (S.D.N.Y. 1990) ("The

_____

[8] The language that Salahuddin focuses on in Jannotti is not discussing the Hobbs Act, but an altogether different statute, 18 U.SC. § 2314, concerning stolen goods.

Hobbs Act, 18 U.S.C. § 1951, does not require that any overt act be committed in furtherance of such a conspiracy to make out a violation."). The Third Circuit has not specifically ruled on this, although some language could be read to support a similar holding. United States v. Driggs, 823 F.2d 52, 54 (3d Cir. 1987) (reciting the elements of a Hobbs Act conspiracy without including an overt act requirement); United States v Traitz, 871 F.2d 368, 380-81 (3d Cir. 1989) (approving of general recitation of elements, which did not include an overt act requirement). And the comments to Third Circuit Model Jury Instructions note that "a Hobbs Act conspiracy does not require proof of an overt act." Third Circuit Model Jury Instructions: Criminal § 6.18.1951 comment (2010). Although, Defendants committed numerous overt acts, such as their continued meetings and discussions with Mazzocchi regarding their plan, I need not decide this issue. What is important for these purposes is that Defendants' concept of an overt act is far broader than what is required under the law. A conspiracy conviction does not require that the substantive crime, the object of the conspiracy, be completed.

Finally, Salahuddin relies on the Third Circuit decision in United States v. Hannah, 584 F.2d 27 (3d Cir. 1978), and cases similar to it, to argue that an inconsistent verdict should not be allowed to stand. As discussed above, I do not find the verdict to be inconsistent. Even assuming it were, however, the Hannah Court explains that generally an inconsistent verdict is of no consequence. It quotes from several leadings cases, including the following from Justice Holmes:

> Consistency in the verdict is not necessary. Each count in an indictment is regarded as if it was a separate indictment. . . . If separate indictments had been presented against the defendant for possession (of liquor) and for maintenance of a nuisance, and had been separately tried, the same evidence being offered in support of each, an acquittal on one could not be pleaded as res judicata of the other. Where the offenses are separately charged in the counts of a single indictment the same rule must hold.

<u>Dunn v. United States</u>, 284 U.S. 390, 393 (1932); <u>Hannah</u>, 548 F.2d at 30 ("Where different offenses are charged in separate counts of a single indictment, an acquittal on one or more of the counts does not invalidate a verdict of guilty on another even where the same evidence is offered in support of each count.") (quoting <u>United States v. Vastine</u>, 363 F.2d 853, 854 (3d Cir. 1966)).

<u>Hannah</u> did vacate a conviction based on an inconsistent verdict, but it involves facts and statutes entirely different than what is before me here.  In <u>Hannah</u>, the defendant was charged with conspiracy to distribute drugs and facilitation.  <u>Hannah</u>, 548 F.2d at 29.  An element of the facilitation count required the commission of an underlying felony, which the Government explained to the judge and jury, was the conspiracy.  The defendant was convicted of facilitation, but acquitted of conspiracy.  Therefore, without an underlying substantive crime, the Third Circuit found that defendant's facilitation conviction could not stand.  The <u>Hannah</u> Court emphasized its holding was "a narrow one."  <u>Id.</u> at 30.  Salahuddin submitted a sur-reply letter brief that cited several other cases that he claims stand for the same proposition: if a charged offense is a predicate offense or constitutes an essential element of another offense, then inconsistent verdicts cannot stand.  Salahuddin Sur-Reply at 4-5.  Again, Salahuddin has not shown these cases to be relevant.  The conspiracy charge here did not require a conviction on an underlying offense nor was an element of the conspiracy necessarily absent because of the jury's acquittal on the substantive offense.  The Government argues that <u>Hannah</u> was overruled by the Supreme Court in <u>United States v. Powell</u>.  Gov't Letter Brief, at 2-3 (Dkt. No. 101) at 2-3 (citing United States v. Powell, 469 U.S. 57, 63-64 (1984)).  I do not find that the <u>Supreme Court</u> explicitly overruled <u>Hannah</u>, but it certainly questioned that case.  <u>United States v. Johnstone</u>, 856 F.2d 539, 544 (3d Cir. 1988) ("In so holding, the [<u>Powell</u>] Court stated that cases such as <u>Hannah</u> were contrary to the inconsistent verdict rule adopted in <u>Dunn v. United States</u>, 284 U.S.

390 (1932).").  Whether <u>Hannah</u> was overruled or not is beyond what I need to review because its holding and facts are inapposite to my decision.

In any event, in questioning the holding of <u>Hannah</u> and similar cases, the Supreme Court explained again why inconsistent verdicts are generally beyond the court's power to review:

> The rule that the defendant may not upset such a verdict embodies a prudent acknowledgment of a number of factors.  First, as the above quote suggests, inconsistent verdicts—even verdicts that acquit on a predicate offense while convicting on the compound offense—should not necessarily be interpreted as a windfall to the Government at the defendant's expense.  It is equally possible that the jury, convinced of guilt, properly reached its conclusion on the compound offense, and then through mistake, compromise, or lenity, arrived at an inconsistent conclusion on the lesser offense.  But in such situations the Government has no recourse if it wishes to correct the jury's error; the Government is precluded from appealing or otherwise upsetting such an acquittal by the Constitution's Double Jeopardy Clause.

<u>Powell</u>, 469 U.S. at 65 (noting also that criminal defendants are protected against inconsistent verdicts by a court's independent review of the sufficiency of the evidence).  As will be discussed below, it is not for me to interpret the meaning behind the jury's verdict.

Cooper mounts a similar defense, albeit under a slightly different theory.  He concedes that, generally, inconsistent verdicts do not necessitate vacating a conviction.  Cooper Reply at 26.  Focusing on the jury's acquittal on Count Two, the attempt charge, rather than the other counts related to the substantive offenses, Cooper argues that the elements for attempt are necessarily subsumed by the conspiracy charge and if any element was lacking to commit an attempt, then it would be an impossibility to maintain the conviction for conspiracy.  In particular, he argues that this impossibility exists in light of the Government's theory of the conspiracy and that any of the conduct alleged as part of that conspiracy would have constituted a substantial act.  In making his argument, however, Cooper improperly equates the elements of attempt with the elements of conspiracy; these crimes are different and address different criminal

conduct.  United States v. Hsu, 155 F.3d 189, 203 (3d Cir. 1998) ("It is well-settled that conspiracy and attempt serve different roles in the criminal law."); United States v. O'Brien, 972 F.2d 47, 52 (3d Cir. 1992) ("Moreover, along the continuum of different criminal activity, attempt crimes are closer to completed crimes than are conspiracy crimes."); see also United States v. Raupp, 673 F.3d 638, 640 (7th Cir. 2012); United States v. Boykins, 966 F.2d 1240, 1245 (8th Cir. 1992) ("Attempt and conspiracy contain different elements of proof…."); United States v. Brito, 721 F.2d 743, 749 (11th Cir. 1983) (rejecting Defendants argument that it was inconsistent for the jury to convict on a conspiracy charge and acquit on an attempt charge based on the same substantive offense).  To prove Cooper attempted to violate the Hobbs Act, the Government had to prove beyond a reasonable doubt that he (1) intended to commit the underlying crime and (2) performed at least one act constituting a substantial step towards the commission of that crime.  Manzo, 636 F.3d at 66.  To be guilty of conspiracy, the jury had to find that Cooper knowingly or intentionally agreed to the conspiracy, knowing of its objective, and intending to join with at least one other to achieve that objective (i.e., sharing a unity of purpose).  United States v. Rankin, 870 F.2d 109, 113 (3d Cir. 1989).  To follow Cooper's argument requires the Court to delve into the jury's thought process.  "Such an individualized assessment of the reason for the inconsistency would be based either on pure speculation, or would require inquiries into the jury's deliberations that courts generally will not undertake." United States v. Powell, 469 U.S. 57, 66 (1984); United States v. Herrera-Genao, 419 Fed. Appx. 288, 296 (3d Cir. 2011) ("As such, we will not reverse a conviction based on mere speculation about the jury's rational deliberation process.").

    It is entirely possible that the jury found that Cooper had the requisite intent for attempt, but that he did not commit a substantial act—or vice versa.  See, e.g., United States v. Nelson, 66

F.3d 1036, 1044 (9th Cir. 1995) ("[T]he overt act required as an element need not have as immediate a connection to the intended crime as the substantial step required for an attempt.") (internal quotations omitted); United States v. Howard, 918 F.2d 1529, 1533 (11th Cir. 1990) ("Although conspiracy also requires proof of an overt act that furthers the criminal venture, the overt act may be otherwise innocuous and need not pose any danger to society or the intended victim of the conspiracy. In contrast, a 'substantial step' towards a criminal attempt usually poses a direct threat to interests protected by law.") (internal citations omitted); cf. Bravman v. Bassett Furniture Industries, Inc., 552 F.2d 90 (3d Cir. 1977) (discussing intent elements of attempt and conspiracy being different in the context of the Sherman Act). It is precisely because of this type of conjecture that the Court will not tread upon the jury's deliberations. Nor do I see any reason why the jury could not have believed the outlined conspiracy charge and still found that Cooper did not come substantially close to committing the offense in order to be guilty of attempt. Simply because Cooper believes that certain conduct would have satisfied the substantial step argument does not mean the jury agreed. And, in any event, it does not somehow negate the Government's theory that a conspiracy existed or refute the substantial evidence introduced supporting that theory. There is no factual impossibility as Cooper suggests. As the Supreme Court has plainly instructed "each count of an indictment is regarded as if it was a separate indictment." Powell, 469 U.S. at 62 (quotations omitted). Even assuming that Cooper is correct that the jury did reject the Government's theory as to the other counts, the jury was properly instructed to look at each count on its own. Therefore, any perceived inconsistency is not enough to vacate a conviction when I find, as I do here, that there is substantial evidence to support that conviction. Id. at 67 ("Finally, we note that a criminal defendant already is afforded protection against jury irrationality or error by the independent review of the sufficiency of the

evidence undertaken by the trial and appellate courts.").

In addition, Defendants argue that according to Rule 33, the Court should dismiss the indictment, or order a new trial, given several trial errors that had a substantial influence on the jury's guilty verdict.  The Court will discuss each of those alleged errors in turn.

### d.  No **Brady** Violation Occurred

Salahuddin asserts that his conviction must be vacated because the Government failed to disclose evidence that could be used to impeach Mazzocchi at the time of trial in violation of Brady v. Maryland, 373 U.S. 83 (1963), and its progeny.[9]  In Brady, the Supreme Court held that due process forbids a prosecutor from suppressing "evidence favorable to an accused upon request . . . where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  Id. at 87.  This extends to evidence that would affect the credibility of a witness.  Giglio v. United States, 405 U.S. 150, 154-55 (1972).  To establish a due process violation under Brady "a defendant must show that: (1) evidence was suppressed; (2) the suppressed evidence was favorable to the defense; and (3) the suppressed evidence was material either to guilt or to punishment."  United States v. Dixon, 132 F.3d 192, 199 (5th Cir. 1997) (citations omitted); see also United States v. Pelullo, 399 F.3d 197, 209 (3d Cir. 2005); United States v. Higgs, 713 F.2d 39, 42 (3d Cir. 1983).

Salahuddin argues that material evidence was not provided before trial that could have affected Mazzocchi's credibility.  On cross-examination, Defendants accused Mazzocchi of bribing Oren Dabney in order to receive government contracts.  Oren Dabney was a municipal official who was a supervisor of Jersey City Incinerator Authority ("JCIA").   Defense counsel questioned Mazzocchi at length about the payments Mazzocchi made to Dabney and whether

---

[9] While Salahuddin raises the argument in his opening brief, he does not respond to the Government's opposition in his reply.

they should be characterized as bribes.  See, e.g., 9/14/2011 Trial Tr. at 16-17; 9/19/2011 Trial

Tr. at 62-63.  On November 23, 2011, after trial had completed and the jury had rendered its

verdict, the Government sent Defendants' counsel a letter stating "The Government has received

information asserting that the Jersey City Incinerator Authority awarded to Mazzocchi Wrecking

six snow removal contracts under Oren Dabney's leadership between 2002 and 2007" and a list

of eight contracts between JCIA and Mazzocchi.  Salahuddin Appx. at 46-57.  This information

came to the Government from an email it received on November 22, 2011.  The Government

does not explain who sent the email nor has it been able to verify the information in that email.

Gov't Opp. at 52-53.

Based on this disclosure, Salahuddin believes he could have further impeached

Mazzocchi at trial, eroding his credibility even more, which would have likely altered the jury's

verdict because Mazzocchi's testimony was the "linchpin" of the Government's case against

Defendants.  Salahuddin Br. at 17.  Nowhere does Salahuddin suggest that the Government

purposefully withheld the evidence; rather that it had constructive knowledge and should have

discovered it before trial.  A prosecutor is charged not just with knowledge of evidence in her

actual possession, but also with knowledge of evidence about which she "should have known."

See United States v. Joseph, 996 F.2d 36, 39 (3d Cir. 1993).  Such evidence is considered within

the prosecutor's "constructive possession."  Therefore, Brady and its progeny place an

affirmative obligation on a prosecutor "to learn of any favorable evidence known to the others

acting on the government's behalf in the case."  Pelullo, 399 F.3d at 216 (quoting Kyles v.

Whitley, 514 U.S. 419, 437 (1995)).  But a prosecutor is not obliged to "to learn of information

possessed by other government agencies that have no involvement in the investigation or

prosecution at issue."  Id. (quoting United States v. Merlino, 349 F.3d 144, 154 (3d Cir. 2003)).

Salahuddin argues that because Mazzocchi was acting under the Government's control, as a cooperating witness, it was charged with his knowledge.  The cases he cites in support concern whether state government officers can be considered as part of the prosecutorial team, which undoubtedly they can, depending on circumstances.  Salahuddin does not offer any support that the Government can be charged with *all* knowledge possessed by a cooperating witness.  The proper question seems to be whether the Government here should have had constructive knowledge of the JCIA's files.  Because Salahuddin has not shown, nor am I able to find based upon the record, that the JCIA was acting on the prosecution's behalf, was part of the investigative team, or that the prosecution had ready access to the JCIA's files, I am not convinced that the Government should be charged with constructive notice of these contracts.  See United States v. Reyeros, 537 F.3d 270, 282 (3d Cir. 2008).

Even if the Government did have constructive possession of this evidence, I am not convinced that it was material.   The Supreme Court has held that there is no Brady violation "unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." Strickler v. Greene, 527 U.S. 263, 281-82 (1999).  Here, Salahuddin has failed to show that the disclosure of these contracts would have changed the outcome of his trial or that it undermined confidence in the outcome of the trial.  As an initial matter, both Salahuddin and Cooper stress in their briefing that Mazzocchi's credibility was "aggressively" challenged on cross-examination.  In Salahuddin's words, Mazzocchi was shown to be a "tax cheat, liar, thief and serial corrupter/briber of municipal officials." Salahuddin Br. at 23.  In the face of such withering cross-examination, it is extremely doubtful that the admission of additional contracts between the JCIA and Mazzocchi would have tipped the jury's assessment of Mazzocchi's testimony; Defendants had already raised the specter of

Mazzocchi being a corrupt liar who bribed public officials, including Dabney.[10]

Indeed, Defendants already knew that Mazzocchi had paid Dabney money and received JCIA contracts.  Counsel questioned Mazzocchi about his involvement with Dabney and the JCIA in detail and suggested during closing arguments that this was another reason why Mazzocchi's testimony should not be believed.  Further, counsel already had evidence in *its possession* that showed Dabney received contracts from the JCIA.  Before trial, the Government produced F.B.I. reports, including one dated March 28, 2006, that detailed how Mazzocchi received JCIA contracts after Dabney was appointed director and how Mazzocchi made payments to Dabney.  "[T]he government is not obliged under <u>Brady</u> to furnish a defendant with information which he already has or, with any reasonable diligence, he can obtain himself." <u>Pelullo</u>, 399 F.3d at 209 (quotations omitted).  This report was marked by Mr. Ashley as Salahuddin Exhibit 1 during trial and shown to Mazzocchi.  9/14/2011 Trial Tr. at 9.  Separately, counsel for both Salahuddin and Cooper questioned Mazzocchi about his relationship with Dabney and whether there was an improper or illegal relationship between the two.  For example, Mr. Ashley questioned as follows:

> Q. And did Mr. Dabney ask for those payments or did you suggest to him you would give him those payments in exchange for getting business from him?
>
> A. Mr. Dabney wasn't in a position to give me business. I gave him that money because once I knew he would take over as the fellow that was in charge, he wouldn't consider my bids if I didn't take care of him.
>
> Q. How did you know that? How did you know he wouldn't consider your bids if you didn't take care of him?
>
> THE COURT: Wait until he finishes his questions.

---

[10] Much of Salahuddin's argument is premised on the idea, also advocated by Cooper, that Mazzocchi's trial testimony was the "linchpin" of the Government's case.  As I discussed earlier, however, this ignores the substantial evidence from the recorded conversations, the documentary evidence, and other witnesses' testimony.

A. Because Mr. Dabney appeared to have other people he was working with, and I knew that he would shut me out and wouldn't allow me to legally bid and legally get awarded jobs.

Q. Did you know that to be a fact, that he had other people that he was working with?

A. Yes.

Q. And you are saying they were paying him also?

A. I don't know that.

Q. You are the only person, to your knowledge, that was actually paying him bribes. Is that correct?

A. I don't know that.

Q. Well, at some point in time your relationship ended when Mr. Dabney decided he didn't want to do it anymore. Is that correct?

A. Correct.

Q. Now, how long did you get that business in Jersey City?

A. With Mr. Dabney I didn't get any business. It was prior to Mr. Dabney.

Q. Why, then, did you continue to pay him on eight occasions from a thousand to $6,000 if you weren't getting any favors?

A. I already had the contract.

Q. So why did you pay him?

A. Because I didn't want him to shut me out when he took over the position.

9/14/2011 Trial Tr. at 16:7-17:21.  And Mr. Zegas also questioned him regarding the same subject matter:

Q. When you made payments to Mr. Dabney, were those payments illegal?

A. He never did anything for me.

Q. Did you make payments to Mr. Dabney?

A. Yes.

Q. The payments were illegal; Correct?

A. I guess so.

Q. You paid him money because you didn't want to be left out of future contracts. Isn't that what you testified to before this jury?

A. Right, didn't want him to work against me.

Q. So just like Mr. Clark you are paying Dabney so he wouldn't work against you in the future. Correct?

A. There was no future.

Q. You did it -- that was your insurance policy so that Dabney would not work against you in the future.  Correct?

A. Correct.

Q. You made payments to the man that were illegal.  Correct?

A. Right.

Q. And that was a bribe. Correct?

A. Correct.

9/19/2011 Trial Tr. at 62:21-63:18.  Mr. Zegas went on to impeach Mazzocchi's answer with the testimony he provided earlier.  Id. at 62-64.  Since Defendants knew that Mazzocchi paid money to Dabney, knew that Mazzocchi received JCIA contracts under Dabney's supervision, questioned Mazzocchi extensively about these dealings, had an opportunity to impeach Mazzocchi's explanation, indeed did impeach him with his prior testimony, and showed Mazzocchi to have bribed public officials for contracts in the past, it strains credulity to find that the additional evidence of contracts was material.  Accordingly, the Court concludes that no Brady violation has occurred.

**e.   There was No Error Regarding the Instructions to the Jury**

Salahuddin argues the Court erred by not specifically instructing the jury to consider evidence of his good character and did not sufficiently explain the "*quid pro quo*" requirement for the Hobbs Act.  First, I note that despite Defendants' counsel discussing, reviewing, and revising the jury instructions during two charge conferences, Defendants did not object to the instructions or raise these arguments before the jury was charged.  Therefore, this constitutes a waiver unless Defendants can show it was plain error:

> Where a party fails to object to the district court's jury instructions, "he waives the issue on appeal, 'unless the error was so fundamental and highly prejudicial as to constitute plain error.'"  United States v. Zehrbach, 47 F.3d 1252, 1261 n.6 (3d Cir. 1995) (en banc) (quoting Bennis v. Gable, 823 F.2d 723, 727 (3d Cir. 1987)); see also Fed. R. Crim. P. 30(d) (stating that failure to object to the court's jury instructions "precludes appellate review, except as permitted under Rule 52(b)").  To find plain error, we must conclude that (1) there was error; (2) the error was clear or obvious; (3) the error affected the defendant's substantial rights; and (4) the error seriously affected the fairness, integrity, or public reputation of the legal proceeding.  United States v. Lee, 612 F.3d 170, 178 (3d Cir. 2010).  If the defendant satisfies this showing, we may, but are not required to, order correction.  United States v. Olano, 507 U.S. 725, 735-36 (1993) (explaining that the discretion conferred by plain error review "should be employed in those circumstances in which a miscarriage of justice would otherwise result" (internal quotation omitted)).

United States v. Tyson, 653 F.3d 192, 211 (3d Cir. 2011).  Salahuddin admits no timely objection was made but briefly comments, by way of footnote, that post-verdict review may be had under the plain error standard.  Salahuddin Br. at 26, n.10.  Nevertheless, he fails to analyze the four factors relevant to the plain error standard at all or demonstrate any potential miscarriage of justice.

Even absent any showing of plain error, I am not convinced the instructions were incorrect.  Regarding the jury's consideration of Salahuddin's good character, the Third Circuit has explained a "standing alone" charge is not mandatory:

> While the [United States v. Baysek, 212 F.2d 446, 447-48 (3d Cir. 1954)] decision approved a "standing alone" charge, it certainly did not require

one…Instead, "all that was required" was that the jury "must have understood that if after consideration of all the evidence, including the character evidence, they were satisfied beyond a reasonable doubt of the defendant's guilt they should convict him even though he offered evidence of good character." 212 F.2d at 448.

\* \* \*

We hold that so long as an instruction consistent with <u>Quick</u>, <u>Frischling</u>, and <u>Baysek</u> is given, which calls the jury's attention to its duty to take character evidence into account with all of the other evidence in deciding whether the government has proved its charge beyond a reasonable doubt, the omission of the express "standing alone" language which was requested here is not an abuse of the discretion vested in the trial court to choose the wording of the character evidence charge.

<u>United States v. Spangler</u>, 838 F.2d 85, 87 (3d Cir. 1988).  My instruction to the jury conformed to <u>Spangler</u>, nearly verbatim, and the cases upon which it relies.  The jury was told the following:

You have heard opinion and reputation evidence about whether defendant Salahuddin had a character trait for honesty and whether he was law-abiding.

You should consider this character evidence together with and in the same way as all the other evidence in the case in deciding whether the government has proved the charges beyond a reasonable doubt.

10/06/2011 Trial Tr. at 62.  The jury was informed of its duty to take character evidence into account with all other evidence in assessing the Government's case.  The cases cited by Salahuddin, in particular <u>Baysek</u> discussed by the Third Circuit in <u>Spangler</u>, do not support a different result, but apply the same standard enunciated in <u>Spangler</u>—that character evidence, if properly before the jury, should be considered and if that evidence or any evidence creates a reasonable doubt as the charge, then the jury must acquit.  <u>See, e.g.</u>, <u>Edgington v. United States</u>, 164 U.S. 361, 366 (1896) ("[T]o the effect that evidence of the good character of the defendant is not to be considered unless the other evidence leaves the mind in doubt, the decided weight of authority now is that good character, when considered in connection with the other evidence in the case, may generate a reasonable doubt.").

Next, Salahuddin argues that the Court was required to instruct the jury that the Government had to show proof of an "explicit promise" in order to sustain a conviction as part of the *quid pro quo* requirement of the Hobbs Act.  Whether such an instruction is necessary depends on the alleged conduct at issue.  For charges averring extortion under the color of official right in the context of political contributions, then there must be a showing of an explicit promise.  "Political contributions are of course vulnerable if induced by the use of force, violence, or fear. The receipt of such contributions is also vulnerable under the Act as having been taken under color of official right, *but only if the payments are made in return for an explicit promise* or undertaking by the official to perform or not to perform an official act." McCormick v. United States, 500 U.S. 257, 273 (1991) (emphasis added).  But outside of this context, such a showing is not necessary:

> We reject petitioner's criticism of the instruction, and conclude that it satisfies the *quid pro quo* requirement of McCormick v. United States, 500 U.S. 257 (1991), because the offense is completed at the time when the public official receives a payment in return for his agreement to perform specific official acts; fulfillment of the *quid pro quo* is not an element of the offense.  We also reject petitioner's contention that an affirmative step is an element of the offense of extortion "under color of official right" and need be included in the instruction.  As we explained above, our construction of the statute is informed by the common-law tradition from which the term of art was drawn and understood.  We hold today that the Government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts.

Evans v. United States, 504 U.S. 255, 268 (1992); United States v. Bradley, 173 F.3d 225, 231 (3d Cir. 1999) (following Justice Kennedy's concurrence in Evans to hold that, outside "non-campaign cases," proof of an explicit promise is not required); see Salahuddin Br. at 37 (quoting Evans language).  In line with this case law, the Court instructed the jury as follows:

> The government is not required to prove the public official made any specific threat or used force or fear to cause the cooperating witness to part with the money or other benefit that the Indictment alleges the defendant attempted to

obtain by extortion under color of right.  However, the government must prove beyond a reasonable doubt that the public official knowingly and willfully, as those terms are defined later in these instructions, used his official position in order to obtain something of value to which he had no right.

\*   \*   \*

Counts 1, 2 and 4 involve benefits and things of value that include political contributions.  Solicitation or acceptance by a public official of a political contribution, by itself, does not constitute extortion under color of official right or bribery even if the person making the contribution has business pending before the official, or if that person has a hope or expectation the official will look favorably upon him as a result of the contribution.  The solicitation and acceptance of political contributions are lawful and appropriate parts of our political system.  However, if a particular defendant as a public official solicits, receives, obtains, or accepts a political contribution knowing that it is given in exchange for an explicit promise or understanding by the official to perform or not to perform a specific official act or course of official action, then that defendant has committed extortion under color of official right and bribery.

10/06/2011 Trial Tr. at 27, 29-30.  Therefore, the jury was informed that an explicit promise was required in the campaign context, as required by the Supreme Court's holdings in McCormick and Evans.  Salahuddin recognizes, even quotes from, this precedent, but nonetheless asserts that other opinions have held otherwise, including Manzo, 714 F. Supp. 2d at 497, discussed above.  After reviewing these cases, the Court finds no support for Defendants' argument.  Indeed, Manzo does not discuss jury instructions in the non-campaign context versus the campaign context.  I find that Salahuddin's argument has no basis in the law and there was no error as to the jury instructions.

**f.  Defendants Have Failed to Show The Government Engaged in Outrageous Conduct or Selective Prosecution**

Cooper argues the Government engaged in (1) outrageous and intolerable conduct and (2) in selective prosecution and that either ground necessitates the Court vacating Defendants' conviction.  The Government argues that both arguments are untimely and lack merit.

The supposedly shocking, outrageous and intolerable Government conduct stems from

the Government's use of Mazzocchi as a cooperating witness.  In particular, Cooper believes that

the Mazzocchi was given free rein to control the investigation and development of the case and

that Mazzocchi was allowed to do so based on his racial prejudices.  In United States v. Twigg,

the Third Circuit explained that "fundamental fairness will not permit any defendant to be

convicted of a crime in which police conduct was 'outrageous.'"  588 F.2d 373, 378-379 (3d Cir.

1978).  There the Drug Enforcement Agency supplied an abundance of the resources and

chemicals necessary to start manufacturing illegal drugs, all under the supervision and authority

of a convicted felon.  That felon then persuaded the defendant to assist him with his enterprise.

The court found that even aside from a defense of entrapment, a conviction could not stand when

the Government "implanted the criminal design in Defendant's mind" and "set him up,

encouraged him, provided the essential supplies and technical expertise."  Id. at 381.

Considering the totality of the Government's conduct combined with the fact that defendant did

not initiate involvement with the crime, the Twigg Court found this "egregious conduct on the

part of government agents generated new crimes by the defendant merely for the sake of pressing

criminal charges against him when, as far as the record reveals, he was lawfully and peacefully

minding his own affairs."  Id.  Only in this one instance has the Third Circuit overturned a

conviction based on outrageous or egregious government conduct.  United States v. Lakhani, 480

F.3d 171, 180-81 (3d Cir. 2007) ("We have said that this principle is to be invoked only in the

face of the most intolerable government conduct—not  each time the government acts

deceptively or participates in a crime that it is investigating.") (internal citation and quotations

omitted).

      The conduct here does not rise to the level described in Twigg.  The evidence supports a

finding that Salahuddin and Cooper set in motion this conspiracy and freely and fully

participated in it.  No evidence suggests this was a scheme hatched entirely by the Government

or Mazzocchi.  Salahuddin and Cooper were not lawfully and peacefully minding their affairs

and duped by government action into fomenting this conspiracy.  The Government did not, on its

own accord, implant the idea for the conspiracy in Defendants' mind, create the conditions or

circumstances to further Defendants' plans, or supply material aid to Defendants' endeavors.

Rather, it appears that Salahuddin and Cooper came to Mazzocchi through Parlavecchio.  As

discussed above, the evidence is replete with affirmative statements by the Defendants

articulating and outlining the contours of their conspiracy.

    Defendants focus on the racial statements and epithets made by Mazzocchi during the

recorded conversations.  This dovetails with Cooper's argument that the Government selectively

prosecuted Salahuddin and Cooper, both African-Americans, and not Mazzocchi and

Parlavecchio, both Caucasian, at the behest of Mazzocchi, because of a racist intent and a bias

against Newark's set-aside program that benefits minorities.  It goes without saying the Court

finds the racial epithets of Mazzocchi and Parlavecchio repugnant to common standards of

decency.  But acquittal is not required whenever the Government has to involve itself with

unsavory characters in the course of conducting an investigation.  To do so would allow few

convictions to stand.  Even if this argument had some merit, Defendants have failed to show that

Mazzocchi exerted complete dominion over the Government's investigation or that it was at all

influenced by similar motivations.

    Cooper's argument that the Government selectively prosecuted only himself and

Salahuddin because they were African-American also fails.  Initially, the Court notes that such

an objection is properly brought before trial.  "'The question of discriminatory prosecution'

relates 'to a constitutional defect in the institution of the prosecution.'  United States v. Berrigan,

482 F.2d 171, 175 (3d Cir. 1973).  A motion alleging a defect in institution of the prosecution must be raised before trial."  United States v. Brookins, 413 Fed. Appx. 509, 514 (3d Cir. 2011) (citing Fed. R. Crim. P. 12(b)(3)(A)).  Nevertheless, even if the objection were properly before the Court, it cannot succeed because Mazzocchi and Parlavecchio are not similarly situated to either Salahuddin or Cooper.

In order to prove discriminatory prosecution, the Court looks to ordinary equal protection standards.  The Supreme Court has articulated the requisite showing to be made: "The claimant must demonstrate that the federal prosecutorial policy had a discriminatory effect and that it was motivated by a discriminatory purpose.  To establish a discriminatory effect in a race case, the claimant must show that similarly situated individuals of a different race were not prosecuted."  United States v. Armstrong, 517 U.S. 456, 465-66 (1996).  Such a showing must be made by "clear evidence."  Id.  Mazzocchi was not similarly situated because he was working with law enforcement, while Salahuddin and Cooper were not.  The Third Circuit has found this to be enough to deny a claim of selective prosecution.  United States v. Rhines, 143 Fed. Appx. 478, 481 (3d Cir. 2005) ("Here, the record establishes that Rhines and Gair were not similarly situated because, as the District Court noted, Gair was cooperating with law enforcement officials while Rhines was not.").  And there was far less evidence concerning Parlavecchio's involvement with the conspiracy.  As discussed above, Parlavecchio may have played an initial role in introducing Salahuddin and Cooper to Mazzocchi, but otherwise was not involved with the Defendants.  Determining why Parlavecchio's involvement essentially ceased would, inappropriately, require conjecture by this Court.  Nor was there evidence developed establishing all of the necessary elements of the conspiracy, as to Parlavecchio, including whether he ever had an intent to join the conspiracy.  Defendants have not met the high burden of establishing either a discriminatory

effect or discriminatory purpose.

### g. The Jury was Free to Disregard Defendants' Alleged Motivation

Finally, Salahuddin argues that his intent was not conspiratorial nor criminal, but benign, and he only sought to advance the interest of minority business owners in Newark.  First, he contends that the exception in 18 U.S.C. § 1951(c) for labor union activities applies to him.  But Salahuddin does not adequately explain how promoting minority business is at all related to labor union activities nor does he cite any case law in support of his argument.  The Court finds that this analogy is too attenuated to bring Salahuddin's conduct within the narrow ambit of § 1951(c).  Moreover, his argument is more appropriately directed to whether he had intent to enter into the conspiracy and has been addressed at times throughout this opinion.  Salahuddin echoes the same argument he made at trial before the jury.  And it was for the jury to accept or deny his theory.  Instead of believing that Salahuddin was solely motivated to provide opportunities for minorities, the jury accepted the Government's theory that Salahuddin conspired to use his official position to benefit himself through his surreptitious relationship with Cooper.  Cooper also argues that the impetus for the arrangement was not to improperly funnel work to Cooper for Defendants' benefit, but to increase minority participation in Mazzocchi's business.  Cooper cites recorded conversations in support.  Again, the jury was free to either believe or disregard this evidence.  Because the jury's verdict was supported by substantial evidence there is no basis to disturb the conviction.

### IV.    CONCLUSION

Defendants' motions are denied.  An order will be entered consistent with this Opinion.

Dated: July 19, 2012                                    /s/    Freda L. Wolfson
                                                        Honorable Freda L. Wolfson
                                                        United States District Judge